IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03376-MEH

BEVERLY LEE SCOTT,

      Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Plaintiff applied for Title II disability insurance benefits and Title XVI supplemental security income under the Social Security Act ("SSA"), 42 U.S.C. §§ 1381, 1382c(a)(3)(B), and 1383. An Administrative Law Judge ("ALJ") rendered a decision finding Plaintiff not disabled under the SSA's definition. The Appeals Council denied her Request for Review, thereby leaving the ALJ's decision final and subject to judicial review. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in the appeal's determination. After reviewing the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

## BACKGROUND

      Plaintiff has a high school education with some business college courses. ECF 8 at 36, 215. Since 2005, she worked in the customer service field for different employers. *Id.* at 230. In October 2013, Plaintiff began working as a Resolution Specialist for an insurance agency. *Id.* at 215.

In 2000, five years before her relevant employment history begins, Plaintiff underwent surgical repair of her heart's mitral valve. Her cardiac health has been monitored intermittently over the subsequent years without indication of significant abnormalities. An ECG performed in January 2010, for example, showed the condition to be stable with just trace mitral regurgitation and minimal mitral valve stenosis. *Id*. at 422.

On July 20, 2016, Dr. Villavert from a family medicine practice filled out a Family Medical Leave Act ("FMLA") form. In that form, Dr. Villavert listed the medical conditions of (1) aortic valve/ mitral valve replacement, (2) pleurisy/ atypical chest pain, (3) mitral valve prolapse with adjunct systolic failure, (4) irritable bowel syndrome ("IBS") with chronic constipation, and (5) low potassium. Dr. Villavert anticipated that flare-ups will cause Plaintiff to miss six days of work a month, plus an additional four hours off every four months for doctor appointments. *Id*. at 656-659.

A cardio ultrasound was performed a week later, on July 28, 2016. It was overall unremarkable, showing only mild plaque build-up. Carotid atherosclerosis was diagnosed, for which the doctor prescribed aspirin. Plaintiff refused statin medication. *Id*. at 420, 425.

Plaintiff underwent an ECG on August 5, 2016. It showed an overall asymptomatic cardiac condition, with just mild abnormalities. There was no change from the prior ECG study in August 2012. *Id*. at 414, 420-421, 424.

The ECG test coincides with the first cardiology-related appointment of record. On August 5, 2016, Plaintiff saw Dr. Maybrook for a follow-up evaluation of her complaints of dyspnea (shortness of breath with exertion) and an episode of tingling in her left arm while playing basketball. Her blood pressure was mildly high at the appointment, but Plaintiff said her home-monitoring showed ongoing low blood pressure readings. Dr. Maybrook diagnosed normal cardiac

2

functioning for which he recommended aspirin. Indeed, taking aspirin quickly had resolved that bout of left arm tingling. Dr. Maybrook suspected either a heart condition, anemia, or deconditioning as the cause of the mild dyspnea episode (and heat or dehydration as the cause for the arm tingling). He expressly excluded the mitral valve condition as a cause for the symptoms. Dr. Maybrook noted no apparent reason for her low potassium. *Id*. at 422-425.

In August 2017, Plaintiff's FMLA leave was extended for another year. *Id*. at 613, 617. On August 28, 2017, Dr. Villavert filled out an FMLA leave form, noting the medical condition of migraine headaches and the related symptoms of nausea, light sensitivity, and dizziness. In addition, flare-ups would cause her to miss six days of work a month, and she would need four hours free every four months for doctor appointments. *Id*. at 611-612.

Plaintiff saw Dr. Maybrook on September 1, 2017. Plaintiff reported feeling great, with no cardiac-related complaints. She was working from home and exercising regularly. Her mitral valve disease condition was overall asymptomatic. She had minimal to mild carotid stenosis, and her cholesterol was normal. Aspirin remained the recommended form of treatment. Dr. Maybrook refilled her levothyroxine prescription for her hypothyroid condition as well as a potassium supplement. *Id*. at 418-420.

The first treatment note from Dr. Villavert of record is dated December 6, 2017. Plaintiff was sixty years old at the time of this appointment. Plaintiff sought treatment for an eczema rash. She also complained of neck pain which she attributed to working out and the onset of colder weather. She requested pain relief in the form of a medication to relax her and to help her sleep. Dr. Villavert prescribed Flexeril. *Id*. at 454.

Plaintiff returned to Dr. Villavert on June 28, 2018 for prescription refills and for a rash on her left foot. She was exercising daily, and her overall health was described as stable. Dr. Villavert diagnosed mixed hyperlipidemia, hypothyroidism, and dermatitis. *Id*. at 447.

On August 31, 2018, Plaintiff requested another FMLA leave extension. *Id*. at 628. In support thereof, Dr. Villavert filled out an FMLA leave form on September 17, 2018. Dr. Villavert listed (1) the cardiac-related conditions of chest pain, palpitations, dyspnea, fatigue, arrythmia, and mitral valve prolapse, (2) severe migraines with associated symptoms, and (3) IBS with diarrhea and constipation. The doctor indicated that flare-ups of these medical conditions will necessitate frequent work absences. *Id*. at 664-676.

Plaintiff retired from her Resolution Specialist job on October 28, 2018, which also is her alleged disability onset date. The ALJ found no substantial gainful activity thereafter. *Id*. at 46, 193, 215.

Plaintiff first applied for Social Security disability benefits on December 31, 2018. She claimed disability due to migraines, microvascular disease, cardiac-related dyspnea, poor stress tolerance, and IBS. *Id*. at 193, 215.

On June 25, 2019, Plaintiff established care with a new treating source, Dr. Peters. At that initial appointment, Plaintiff complained of IBS with diarrhea, migraines, stress, low energy, and weight gain. Plaintiff declined an Imitrex prescription for the migraine condition, preferring to treat it with ibuprofen instead. Plaintiff's levothyroxine prescription was renewed, and its dosage adjusted to restore effectiveness. *Id*. at 378.

Plaintiff returned to Dr. Peters on November 19, 2019. She reported experiencing a gastro-intestinal flare-up after unilaterally ceasing her medication one month earlier. Dr. Peters restarted her Zantac prescription (which Plaintiff said was effective at controlling the condition). Plaintiff

also complained of diarrhea and stress. She was overdue for the next routine thyroid check. *Id*. at 433.

Plaintiff saw Dr. Peters on December 2, 2019 for a general physical and wellness examination. She denied any gastric or IBS-related symptoms, and she also denied dyspnea. She expressed only the vague complaint of feeling not quite right. *Id*. at 432. On December 27, 2019, she sought care for a bout of dysuria. *Id*. at 430.

Plaintiff's next appointment with Dr. Maybrook was in December 2019 at which time she reported a dyspnea episode. She described herself as "retired" from employment but now "busy running her grandkids around everywhere." She also was working out three to four times a week. She was sixty-two years old. A stress echo test was overall normal, except for a "fair amount" of premature ventricular contractions ("PVCs"). Dr. Maybrook described Plaintiff's cardiac health as non-ischemic. Possible causes for the shortness of breath were deconditioning, arrhythmia, or thyroid condition, he speculated. In light of the newly observed PVCs, Dr. Maybrook prescribed propranolol. *Id*. at 462-466.

Plaintiff returned to Dr. Maybrook on May 15, 2020 with a dyspnea complaint. Because Plaintiff was doing overall well, Dr. Maybrook saw no need for cardiac testing (such as wearing a Holter monitor). He encouraged her to take the earlier-prescribed propranolol medication (which she had not yet begun to do) should the dyspnea worsen. Dr. Maybrook attributed her PVCs to life stressors rather than a heart defect. *Id*. at 556-558.

Plaintiff reported no ongoing symptoms at the August 21, 2020 follow-up appointment. Her only complaint was a bout of left arm pain while sitting, which she attributed to stress secondary to her nephew's passing and her son's alcoholism. A SPECT stress test administered on August 21, 2020 was overall unremarkable except for moderate chest pain and PVCs with exercise.

Dr. Maybrook attributed her left arm pain to stress rather than a cardiac condition. He again encouraged her to take propranolol. *Id*. at 551-553.

On November 20, 2020, Plaintiff reported benefit from taking the propranolol medication. She added the new complaint of palpitations when feeling angry, and left arm pain from stress over her nephew and son. She described a nevertheless overall improved condition since the previous appointment. *Id*. at 604.

Plaintiff returned to Dr. Peters on January 29, 2021 for a new IBS medication because the old one no longer was available. Although she was living with her adult son who had health problems, she still had overall less stress in her life. Because of both that life stress reduction and the benefit of ibuprofen, she was experiencing fewer migraines. Dr. Peters prescribed Pepcid for her IBS and Imitrex for her migraines. Stress-related gastroesophageal reflux disease ("GERD") was diagnosed. *Id*. at 579. Plaintiff saw Dr. Peters again on February 16, 2021 with COVID-related concerns. In addition, the dosage of Plaintiff's Premarin medication—which she had been taking over the preceding treatment history—was adjusted after an increase in menopausal symptoms. *Id*. at 597.

Plaintiff testified at the hearing held March 26, 2021. Plaintiff described her conditions of migraines, IBS, and cardiac health in very severe terms. She experiences a migraine headache once or twice a month. Each one lasts five to ten days, leaving her wholly incapacitated. She must lie down in a dark room, sleep, and take medication. Her migraine prescriptions make her drowsy. She said that the migraine condition had begun in 2001, and it was the reason for the FMLA leave requests (for which she had received permission to miss three workdays a month). Despite its claimed severity, she relies on over-the-counter medication to ease them. Four to five times a month her IBS flares up, with each episode lasting twelve hours. During a flare-up, she must lie

down on her stomach, and she must stay near a restroom. She is unable to hold food down. Stress

is the only trigger of both the migraine and IBS conditions, she clarified. She is short of breath,

both while at rest and with exertion, a condition which she attributes to her heart health. After ten

to thirty minutes of exertion—for example, operating a vacuum cleaner—she develops heart

palpitations. The palpitations ease after a five minute break. Plaintiff described a very narrow range

of household activities, relying mainly on her adult son. Plaintiff still exercises, and she claimed

no walking or sitting limitation. *Id*. at 31-55.

## THE FIVE-STEP PROCESS FOR DETERMING DISABILITY

To qualify for SSA benefits, the claimant must meet be insured, younger than sixty-five

years of age, and disabled. 42 U.S.C. §§ 416(i), 423, 1382. A five-step sequential evaluation

process guides the determination of whether an adult claimant meets SSA's definition of disabled.

For SSA purposes, "disabled" means the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140

(1987).

Step One asks whether the claimant is presently engaged in substantial gainful activity. If

he is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination

of whether the claimant has a medically severe impairment or combination of impairments under

20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant shows only a minimal effect on the ability

to do basic work activities, he is not eligible for disability benefits. 20 C.F.R. 404.1520(c). Step

Three tests whether the condition equates with a listed impairment deemed to be of disabling

severity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If a Listing is not met, then disability is not

presumed, and the analysis progresses to an RFC assessment at Step Four. The RFC is an administrative determination based on the full evidentiary record of the most a claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 404.1546(c). The RFC is used at both Step Four and Step Five. Step Four requires the claimant to show how his impairment(s) and RFC prevent him from performing his past jobs. If the claimant remains capable of previous employment, he is not disabled. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).

Finally, if the claimant establishes a prima facie case of disability at Step Four, the analysis proceeds to Step Five where the ALJ determines whether a claimant with the same vocational profile (age, education, work experience, and RFC) can perform other work in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## ALJ's RULING

At Step Two of the disability analysis, the ALJ determined Plaintiff to have the severe impairments of migraines, IBS, GERD, dyspnea, and history of mitral valve disease status-post mitral valve repair. *Id*. at 18.

Of the conditions that count as severe impairments, the ALJ found none to be of Listing-level severity to permit a Step Three finding of disabled based on the medical evidence alone. There was no objective medical evidence to meet the criteria needed to support a heart, respiratory, or GERD-related Listing. Indeed, the various physical examinations consistently showed no abnormalities generally or impairments on exertional ability. The ALJ considered the claimed migraine condition under the epilepsy Listing, its closest analogy, *see Dunlap v. Colvin*, No. 15-cv-02139-NYW, 2016 WL 5405208, at *9-10 (D. Colo. Sept. 28, 2016) (noting the general rule that the Commissioner should consider migraines under Listing § 11.03 for non-convulsive epilepsy), because her migraines did not occur more than once a week. *Id*. at 18-19.

At Step Four, the ALJ assessed Plaintiff's RFC after reviewing the record evidence and testimony. The ALJ assessed Plaintiff capable of sedentary work, albeit with no exposure to any ladders or other hazards and with climbing stairs and ramps and exposure to cold temperatures both limited to just an occasional basis. *Id*. at 20. This RFC assessment, the ALJ explained, addresses the limitations that Plaintiff's "symptoms, like her alleged dyspnea," cause. *Id*. at 23.

In assessing the RFC, the ALJ noted Plaintiff's subjective allegations of the claimed conditions' severity and impairing effects. *Id*. The ALJ also reviewed the treatment records. Over the full treatment history, the ALJ repeatedly observed, Plaintiff maintained a "good deal" of functional ability despite occasional minimal symptoms. Physical examinations revealed no abnormality. Plaintiff's daily life activities suggested no impairment. She continued to exercise regularly, and she actively cared for her grandchildren. There was no objective indication of any difficulty with Plaintiff's ability to physically move around, and there was no confirmation of the alleged migraine frequency. Medications, including the over-the-counter type, were helpful. In short, the ALJ saw nothing in the medical records or in Plaintiff's daily life activities to corroborate her subjective allegations. *Id*. at 21-22.

The ALJ acknowledged the role of stress. Stress (situational to two particular concerns) was the cause of her dyspnea and palpitation complaints rather than cardiac health. Conversely, Plaintiff's retirement had caused a reduced stress level with beneficial effect (such as fewer migraines). On balance, the overall reduced stress level after retirement had caused a general improvement in health. *Id*.

The ALJ considered the medical opinion evidence of record. The ALJ found the reports of the two non-examining medical advisors, Dr. Platter and Dr. Barrett, to be generally persuasive. *Id*. at 22. The ALJ included the FMLA paperwork that Dr. Villavert had filled out. The ALJ found

the absenteeism frequency that Dr. Villavert reported to be unsupported by the record evidence (for the same reason the ALJ found Plaintiff's assertion of even greater absenteeism frequency unsupported). *Id*. at 23.

Also testifying at the hearing was a vocational expert ("VE"). The VE classified Plaintiff's past relevant work as that of a customer service representative (skilled) and claims clerk (semi-skilled). The ALJ asked the VE what effect "be[ing] absent five to ten days a month as a result of" medical conditions would have on someone's ability to perform those two jobs "or any jobs in the national economy." *Id*. at 59. Such "excessive absenteeism," the VE answered, would prevent someone from "maintain[ing] any competitive employment in any job." *Id*.

Relying on the VE's testimony, the ALJ found Plaintiff's RFC as assessed (and thus excluding the claimed absenteeism rate) to permit her return to her past work. *Id*. at 23. The ALJ therefore concluded at Step Four of the disability analysis that Plaintiff is not disabled, obviating the need to progress to the Step Five inquiry regarding other kinds of work.

## STANDARD OF REVIEW

Judicial review is limited to two inquiries: (1) whether the correct legal standards were applied and (2) whether the final decision is supported by substantial evidence in the record as a whole. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

Reversal is appropriate if the ALJ either applies an incorrect legal standard or does not demonstrate reliance on the correct one. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). If the ALJ applied the correct standard in making a determination, then the Court considers whether the fact-findings enjoy evidentiary support.

A factual determination requires the support of competent substantial evidence from the administrative record. The term "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The threshold for such evidentiary sufficiency is not high: it is "more than a mere scintilla." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). In making that determination, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, the Court still must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

## ISSUES ON APPEAL

### I.    Migraine and IBS Flare-Ups

Plaintiff focuses on the episodic nature of her migraine and IBS conditions. Obviously, if Plaintiff is experiencing no flare-ups, then there are no limitations on functioning. In this sense, Plaintiff's objection to the RFC assessment for accommodating no migraine or IBS-related impairment at all is misplaced. The dispositive question instead is the extent to which a migraine or IBS flare-up affects work ability *when they do occur*.

At the hearing, Plaintiff claimed that she missed up to ten days of work a month because of migraines, a condition which she has had since 2001. She misses an additional four to five days

of work a month because of IBS flare-ups. She is totally incapacitated during the occurrence of either. In total, they result in fifteen days of sick leave a month. The ALJ considered that allegation but found no evidence in the record to confirm either the frequency or severity of the flare-ups as Plaintiff described them. Neither the treatment notes nor Plaintiff's daily life activities indicated the presence of the alleged impairment.

The ALJ included for consideration the FMLA leave paperwork that Dr. Villavert filled out. The ALJ noted Dr. Villavert's assertion that migraine and IBS flare-ups cause Plaintiff to miss many days of work a month. The exact number Dr. Villavert gives varies somewhat in the forms. In July 2016, Dr. Villavert anticipated six missed workdays a month from Plaintiff's heart condition and IBS. ECF 8 at 659. In August 2017, Dr. Villavert added that IBS would cause Plaintiff to miss six workdays a month. *Id*. at 676. In September 2018, Dr. Villavert calculated the number of workdays Plaintiff would miss each month as three because of migraines (*id*. at 664); three because of IBS (*id*. at 670); and three because of her heart condition (*id*. at 667). These total nine days of missed work a month. Alternatively, Dr. Villavert indicated a total of just three missed workdays a month because of all three conditions combined. *Id*. at 672. In other words, Dr. Villavert described a three to six day range of monthly absenteeism. The ALJ focused her consideration on the six-day end of that range (three episodes a month, each of two days' duration) as caused by gastrointestinal symptoms and migraines. *Id*. at 22.

The Court notes that the FMLA forms were forward-looking. There is no evidence of prior days of work that Plaintiff actually missed because of migraines or IBS, such as in the form of a doctor's letter excusing a past work absence or as otherwise memorialized in a treatment note. Instead, the FMLA forms anticipate Plaintiff's future medical leave needs. Nor is it clear how the

FMLA forms support a finding of disability. The forms imply that Plaintiff remained capable of full-time employment so long as her employer permitted the requested accommodation.

Nevertheless, the ALJ gave Plaintiff the benefit of construing them as medical opinion evidence. The ALJ gave several reasons for finding Dr. Villavert's opinion about anticipated leave needs to be unpersuasive. First, the ALJ observed that the doctor's credentials were unknown, with the record indicating only a family medicine practice. Given the lack of accompanying treatment notes from Dr. Villavert, it was a relevant point for the ALJ to highlight. There is no indication of a migraine or IBS practice focus. Relatedly, the ALJ noted the lack of a discussion about supportive objective medical findings. In the absence of such, Dr. Villavert's opinion "appeared [to be] based solely upon [Plaintiff's] subjective reporting." *Id*. at 23. As such, the analysis of the FMLA forms is the same as the analysis of Plaintiff's subjective allegations, and as the ALJ accurately stated, nothing in the record supports even the lesser absenteeism frequency that Dr. Villavert described.

Nor, on appeal, does Plaintiff explain how the evidence confirms her claimed need to miss six or more days of work every month because of migraines and IBS. Plaintiff faults the ALJ for making no accommodation whatsoever, but that does not mean the ALJ ignored the matter. The ALJ expressly did consider the work-related impairment *as Plaintiff framed it*. Finding no evidence to support the claim, there was no reason to include that impairment in the RFC assessment.

It is true that a simple difference in the details in how a claimant describes the frequency and severity of an episodic condition, such as the dizzy spells at issue in *Otte v. Berryhill*, No. 18-2006-JWL, 2018 WL 5263515, at *5 (D. Kan. Oct. 23, 2018) (applying SSR 16-3p), do not necessarily mean that the allegation is inaccurate. This case presents a different situation. Here, by contrast, the record contains just two descriptions of the impairing effects of Plaintiff's migraines

and IBS—her own subjective allegation and the FMLA paperwork—which both described flare-up frequency of six or more days of absenteeism a month. The issue was whether the evidence supported the claimed impairment on the whole rather than differences on how Plaintiff described it over the course of an ongoing treatment history.

Plaintiff's objection instead may be construed as the ALJ's failure to accommodate some *lesser* degree of impairment than claimed. Not only does Plaintiff herself not quantify what that lesser amount of absenteeism should be, but in making that argument, she implicitly concedes needing fewer sick days than she initially had requested from her employer and far fewer than she asserted in her disability application. In that sense, Plaintiff effectively amends her disability claim to be based on fewer days of missed work than she initially claimed but presumably still above the amount of absenteeism that full-time competitive employment would tolerate. Neither Plaintiff nor the ALJ developed the instant record was to what that latter figure is, but the Court notes that the vocational expert in the *Dunlap v. Colvin* case answered that an employee may miss two days of work a month. 2016 WL 5405208 at *11.

The Court reaches the same result if Plaintiff's objection concerns the *severity* of impairment during the occurrence of a migraine or IBS flare-up. Just as there is no evidence to support the claimed frequency of their occurrences, there is no evidence to confirm the claimed incapacitating effect when they do occur. Plaintiff does not quantify what lesser degree of impairment the ALJ should have accommodated instead.

The Court sees no other error in the ALJ's consideration of either episodic condition, whether migraines or IBS discomfort. The ALJ did not dispute the diagnoses themselves, for example on the basis of the lack of confirmatory objective medical evidence; to the contrary, the ALJ counted both as "severe impairments" for Step Two purposes. In other words, the ALJ did

14

not reject the existence of either medical condition simply because of a lack of objective diagnostic tests, an error which *McGaha v. Barnhart*, No. CIV 05-082 KBM, 2005 WL 8163485, at *9 (D.N.M. Dec. 23, 2005) discusses, citing *Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.Fla. 1996). Moreover, the ALJ adequately discussed the conditions at Step Three of the disability analysis, in contrast to the situation in *Lindsay v. Kijakazi*, No. 21-cv-02063-EFM, 2022 WL 612452 at *14 (D. Colo. March 2, 2022) and *Dunlap*, 2016 WL 5405208 at *8-10, which remanded the matter back to the Commissioner to reconsider those claimants' respective headache conditions at Step Three. Moreover, *Lindsay* and *Dunlap* are distinguishable on their facts. Both of those claimants' migraine/headache-based claims were far more developed in the treatment and employment records than here.

This case is more similar to *McGaha* in which no error was found in the ALJ's migraine analysis. *McGaha* claimed the occurrence of migraines two to three times a month, each lasting between three to ten days, during which time she was wholly incapacitated. The ALJ rejected that allegation as inconsistent with what the medical evidence, treatment history, and work activities all showed. 2005 WL 8163485 at *7. Moreover, as here, the basic thrust of the ALJ's reasoning was apparent enough to permit meaningful judicial review. *Id*. at *6. This Court disagrees that the ALJ's analysis of her disability claim lacks a logical bridge between the record discussion and the RFC assessment.

## II. Stress

Plaintiff complains that the RFC assessment makes no provision for a stress-related impairment. Exactly what stress-related medical condition she is asserting is unclear. The medical record contains no diagnosis of stress as its own medical condition, and no formal medical treatment was directly provided for stress (other than the recommendation to take aspirin as a

means to reduce anxiety). Instead, stress played an indirect role. Doctors (and Plaintiff herself) cited it as an explanation for symptoms in the absence of an objective medical cause, for the purpose of ruling out medical causes and the need for diagnostic studies. In other words, "stress" provided a way to explain why the underlying medical conditions were not of concern.

On appeal, Plaintiff highlights the exacerbating effect of stress as the cause of her complained-of symptoms, but in making that argument, Plaintiff overstates its role in the treatment records. Plaintiff attributed her stress to two particular family matters, the death of a nephew and her son's medical problems. Obviously, both matters were of substantial concern for her, as they would be for anyone. However, they were two discrete non-medical factors, and the stress was situational to them. Conversely, Plaintiff reported the benefits of reduced stress after her retirement. However, neither the treatment record leading up to her retirement nor Plaintiff's disability application indicates how stress was interfering with her ability to work. The case of *Hiserodt v. Astrue*, No. 10-cv-0498-WYD, 2011 WL 3759774, at *13 (D. Colo. Aug. 25, 2011), by contrast, concerned medical findings that more clearly documented a causal relationship between the claimant's chronic pain condition and resulting emotional stress, the claimant's experience of both mental and physical forms of stress, and the relationship between that stress and the onset of his other physical health conditions.

The other way in which stress enters Plaintiff's disability claim is as the trigger of her migraine and IBS flare-ups. However, as the Court discusses above, there simply was no evidence to confirm the kind of migraine or IBS impairment that Plaintiff claimed. Because the Court sees no error in how the RFC assessment accommodates those conditions themselves, this Court sees no error in the absence of an accommodation for the underlying stress trigger.

The ALJ did not ignore how stress affected her medical conditions. The ALJ accurately recounted how stress was discussed in the treatment records and how Plaintiff described it at the hearing. The ALJ also observed how Plaintiff retained overall good functional ability despite it and its role as an aggravating factor of her other claimed impairing conditions. The evidentiary record simply lacked a sufficient basis to account for it separately in the RFC assessment.

## CONCLUSION

Plaintiff contends that the RFC assessment wholly fails to account for all work impairments and that the Decision lacks an adequate explanation for excluding them. This Court disagrees. It is not the lack of a logical, explanatory bridge that is the issue, but rather the lack of evidence to support the existence of those claimed impairments in the first place. Having reviewed the parties' arguments and having independently reviewed the entire record, the Court finds the ALJ's decision to enjoy evidentiary support and consistent with governing law. Consequently, the Court sees no grounds warranting reversal or remand.

Accordingly, the ALJ's determination that Plaintiff is not disabled is AFFIRMED. The Clerk of Court shall enter judgment in Defendant's favor and shall close this civil action.

Entered this 17th day of November, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge